**A F F I D A V I T**

STATE OF WEST VIRGINIA

COUNTY OF CABELL, to-wit:

I, Georgia Marshall, being first duly sworn, do hereby depose and state as follows:

1. This affidavit is made in support of an application for a search warrant for information associated with cellular telephone number (828) 620-4042, with listed subscriber as Nehmiah Griggs, 381 Silver Oak Dr, Dallas, GA (hereinafter "TARGET TELEPHONE"), whose service provider is AT&T located at 11760 US Highway 1, North Palm Beach, Florida 33408, a wireless telephone service provider. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require AT&T to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I have been a Special Agent with the Federal Bureau of Investigation (hereinafter the "FBI") since 2019. I am a graduate of the FBI Training Academy in Quantico, Virginia, where I received training in controlled substance

investigations, white-collar crime, cyber-crime, crimes against children, interviewing, interrogation, evidence collection, intelligence analysis, and legal matters, among other topics. I have been an Affiant on multiple federal search warrants and Title III affidavits. I am currently assigned to the Huntington, West Virginia Resident Agency of the Pittsburgh Division. Prior to my current assignment, I was a Special Agent with the Air Force Office of Special Investigations from 2015 to 2019 where I investigated federal offenses committed by Air Force members and/or offenses committed on Air Force installations. I have experience investigating complex drug trafficking organizations, firearm violations, and child exploitation offenses, as well as other violations of federal law. As a Special Agent, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).

3. I have obtained the facts set forth in this Affidavit through my personal participation in the investigation, from oral and written reports of other law enforcement officers, from records, documents and other evidence obtained during this investigation, and from other sources of information as referenced herein. This affidavit is intended to show merely that there is sufficient probable cause for the requested

2

warrant and does not set forth all my knowledge about this matter.

4. Based on facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 846 (conspiracy to distribute methamphetamine) and 21 U.S.C. § 841(a)(1) (distribution of methamphetamine) have been committed by GRIGGS and others. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B.

## BACKGROUND ON WIRELESS PROVIDERS

5. In my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell site data, also known as "tower/face information" or "cell tower/sector records." Cell site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. Accordingly, cell site data

3

provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

6. Based on my training and experience, I know that AT&T can collect cell site data about the TARGET TELEPHONE. I also know that wireless providers such as AT&T typically collect and retain cell site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

7. Based on my training and experience, I know that wireless providers such as AT&T typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as AT&T typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may

4

constitute evidence of the crimes under investigation because the information can be used to identify TARGET TELEPHONE's user or users and may assist in the identification of co-conspirators and/or victims.

**PROBABLE CAUSE**

8. The FBI Huntington TOC West Task Force (hereinafter "FBI TF") is currently conducting a criminal investigation of DERRELL MASSEY, also known as "Rell" (hereinafter "MASSEY"), NEHMIAH ALLEN-GRIGGS, also known as "Newski" (hereinafter "GRIGGS"), and others participating in a drug trafficking organization (DTO) involved in the distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1) and a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846.

9. Through the course of the investigation, investigators have learned that GRIGGS utilizes the TARGET TELEPHONE to facilitate the distribution of controlled substances.

10. On August 11, 2023, Chief United States District Judge Thomas E. Johnston, signed an Order authorizing the interception of wire communications for three telephones utilized by MASSEY and others, one of which was (304) 654-0825. On September 8, 2023, and October 6, 2023, Chief United States District Judge Thomas E. Johnston signed additional Orders authorizing the

continued interception of the telephone assigned call number (304) 654-0825 for periods of thirty (30) days on each occasion.

11. The TARGET TELEPHONE was first identified from MASSEY's toll data for telephone number (304) 654-0825 from July and August 2023. Subpoena information resulted in GRIGGS being the listed subscriber for the TARGET TELEPHONE. An open-source record check of CashApp found the TARGET TELEPHONE was associated with GRIGGS' CashApp, $nuskinolove74.

12. On March 1, 2023, members of the Huntington TOC West Task Force conducted a controlled buy operation on MASSEY at 3333 US Route 60, Huntington, West Virginia. The CHS set up a purchase of one pound of methamphetamine for $2,000. The CHS and their vehicle was searched with negative findings. The CHS was provided $2,000 in prerecorded buy money. The CHS was followed to 3333 US Route 60, Huntington, West Virginia and overserved parking. A few moments later a white Chrysler van with Ohio registration JWY6139 was observed pulling into the parking lot. The CHS, in his/her vehicle, drove over to the van. The driver of the van was identified as "Newski", known to investigators as GRIGGS. GRIGGS exited the driver side door of the van and entered the CHS' vehicle. A short time later GRIGGS exited the CHS' vehicle, re-entered the van and departed. The CHS returned to investigators and turned over a bag of

6

approximately 427.7 grams of lab tested positive methamphetamine. The CHS described that GRIGGS was a runner for MASSEY and GRIGGS was the one who provided the CHS the methamphetamine. A review of the buy video confirmed the CHS's statements.

13. On May 3, 2023, during a controlled purchase operation that was conducted utilizing a CHS, at approximately 4:22 PM, a grey Chrysler Voyager with Florida registration QMTA34, (hereinafter the "Voyager"), drove down 9th Avenue in Huntington and stopped in front of 606 9th Avenue, located in Huntington, West Virginia, and a black male, believed to be GRIGGS, exited the Voyager and entered 606 9th Avenue. At approximately 4:25 PM, GRIGGS exited 606 9th Avenue and entered the Voyager and departed. A few minutes later the CHS exited 606 9th Avenue carrying a white paper bag. The CHS entered his/her vehicle and departed the area to a predetermined meeting location. At approximately 4:46 PM, agents observed the Voyager return to the area near 606 9th Avenue and two black males, one of whom was believed to be GRIGGS, exited the Voyager and entered 606 9th Avenue. The men appeared to be carrying fast food bags. Other investigators with the CHS conducted a debrief with him/her and they provided that while he/she was inside the residence "Newski", whom investigators know as GRIGGS, entered

7

the residence and asked MASSEY for a gram and a half of heroin because he had a "play" to make. MASSEY provided GRIGGS with the controlled substance and GRIGGS departed. Based on my training and experience I know the term "play" to refer to a drug transaction. A review of the buy video confirmed the CHS's statement. Based on my training, experience and the investigation thus far I believe that GRIGGS obtained controlled substances from MASSEY inside 606 9th Avenue, entered back into the Voyager, departed the area to conduct a drug transaction then obtained food prior to returning to 606 9th Avenue.

14. On October 25, 2023, at approximately 2:31 PM, MASSEY on (304) 654-0825, received an incoming call from GRIGGS on the TARGET TELEPHONE, reference session 19825. The following is a portion of what was discussed:

| | |
|---|---|
| GRIGGS: | Hey fat boy. |
| MASSEY: | What up? |
| GRIGGS: | How much for an ounce of that shit? |
| MASSEY: | Huh? |
| GRIGGS: | How much for ahh, for ahh, for an ounce? For that boy, or I mean that girl. Huh? |
| MASSEY: | Seven. |

15. Based on my training and experience, and the investigation thus far, I believe that GRIGGS asked MASSEY for the price of cocaine ("How much for an ounce of that shit?"),

8

but initially MASSEY did not understand GRIGGS ("Huh?"), so GRIGGS repeated how much an ounce of cocaine would cost ("How much for ahh, for ahh, for an ounce? For that boy, or I mean that girl. Huh?"). MASSEY told GRIGGS it would be $700 dollars to purchase an ounce of cocaine. ("Seven.")

16. On October 25, 2023, at approximately 7:47 PM, MASSEY on telephone number (304) 654-0825, received an incoming call from GRIGGS on the TARGET TELEPHONE, reference session 19901. The following is a portion of what was discussed:

| | |
|---|---|
| GRIGGS: | Yeah fat boy I need that umm, that, that one thing we talked about earlier. |
| MASSEY: | What? |
| GRIGGS: | That umm, that girl. |
| MASSEY: | What you talking about? What (inaudible)? |
| GRIGGS: | Huh? |
| MASSEY: | I am about out a four way I gonna have like twelve zips of it. |
| GRIGGS: | I just need one. |
| MASSEY: | Huh? |
| GRIGGS: | I just need one. |
| MASSEY: | I can't hear you. |
| GRIGGS: | I just need one. |
| MASSEY: | Alright. |

9

17. Based on my training and experience and the investigation thus far I believe GRIGGS requested the item they spoke about earlier in the day ("Yeah fat boy I need that umm, that, that one thing we talked about earlier."), but MASSEY did not hear GRIGGS ("What?"). GRIGGS stated he wanted cocaine or "girl". ("That umm, that girl."), however, MASSEY again did not understand what GRIGGS asked for ("What you talking about? What (inaudible)?"). GRIGGS did not understand MASSEY's response ("Huh?"). MASSEY informed GRIGGS that he already sold four ounces of cocaine, and only had twelve ounces left ("I am about out a four way I gonna have like twelve zips of it."). GRIGGS stated he only needed one ounce of the cocaine from MASSEY's remaining inventory ("I just need one."), but MASSEY did not hear GRIGGS ("Huh?), therefore, GRIGGS reiterated his need for one ounce ("I just need one."). However, again, MASSEY could not understand GRIGGS ("I can't hear you.") and GRIGGS repeated himself one more time ("I just need one."). MASSEY responded in the affirmative ("Alright").

18. On October 29, 2023, KYLA SMITH, on telephone number (304)360-7182, engaged in a conversation about moving firearms with GRIGGS on the TARGET TELEPHONE, reference sessions 1504 and 1506. A review of pole camera footage with a view of the rear of 245 Davis Street, Huntington, West Virginia, (hereinafter "the

10

Davis residence"), provided that at approximately 2:51 P.M. SMITH's rental silver Ford Edge pulled into the rear driveway of the Davis residence. A person, believed to be SMITH, entered the rear door of the Davis residence and a few minutes later the rear door of the Davis residence opened and someone exited. SMITH's rental silver Ford Edge pulled out of the rear driveway of the Davis residence and departed south on Francis Court. While coordinating to have SMITH pulled over by law enforcement, a phone call was made on October 29, 2023, reference Session 1506, from SMITH's telephone number, (304)563-5376, to GRIGGS's telephone number, (828)620-4042, wherein SMITH asked GRIGGS what he wanted her to do with a firearm. A portion of the conversation is below:

GRIGGS: Yeah cuddy?

SMITH: Umm (Unidentified Male talking in background), what you wanna do with these guns?

GRIGGS: What I wanna do wit em? Ummm (talks to MASSEY in the background) whachu wanna do with them poles Fat Boy? (MASSEY in background responding to GRIGGS but it was unintelligible) (Unidentified Female in background talking as well but it is also unintelligible). Bring 'em, bring 'em over here doe. For real we needa (unintelligible). Huh?

SMITH: Hell nah! The Sheriff following me an shit.

GRIGGS: For real?

SMITH: Yeah.

11

GRIGGS: Mmm. (unintelligible) We really needa pipe in dis bitch. I don't know how we ain't got no pipe in here.

19. Based on my training, experience and the investigation thus far I believe after GRIGGS greeted SMITH ("Yeah cuddy?") and SMITH asked GRIGGS what he wanted to do with the guns she had ("Umm (Unidentified Male talking in background), what you wanna do with these guns?"). GRIGGS then asked MASSEY in the background what did they want do with the guns and then responds to SMITH for her to bring the guns "over here" ("What I wanna do wit em? Ummm (talks to MASSEY in the background) whachu wanna do with them poles Fat Boy? (MASSEY in background responding to GRIGGS but it was unintelligible) (Unidentified Female in background talking as well but it was unintelligible). Bring em, bring em over here doe. For real we needa (unintelligible). Huh?"). SMITH then exclaimed and stated a Cabell County Sheriff's Deputy was following her ("Hell nah! The Sheriff following me an shit."). GRIGGS asked if SMITH was telling the truth ("For real?") and SMITH responded in the affirmative ("Yeah."). GRIGGS states that they need a "pipe", a slang term for a gun, in their new house, believed by investigators to be 2729 Highlawn Avenue, Huntington, West Virginia (hereinafter "the Highlawn residence"), because they did not have a gun at the time ("Mmm. (unintelligible) We really

12

needa pipe in dis bitch. I don't know how we ain't got no pipe in here.").

20. While the call was ongoing, surveillance noted that SMITH made an immediate right turn onto 22nd Street, and then another right turn into the parking lot of the Shell gas station located at 2208 8th Avenue. SMITH was subsequently traffic stopped by the Cabell County Sheriff's Department. SMITH was asked to step out of the vehicle and wait at the rear of her vehicle. As she exited the vehicle, SMITH adjusted her pants. Deputy Ferguson conducted a pat down search of SMITH's person. As Deputy Ferguson ran her hand up the inside of SMITH's leg, her hand made contact with something that she (Ferguson) described as "hard and chunky", and knew, based on her training and experience, to be consistent with controlled substances. Deputy Ferguson asked Smith to remove the item from her pants, and Smith complied. The item in question was a plastic zip-loc bag, containing approximately half a pound of suspected methamphetamine. After deputies completed the search of the vehicle, they were unable to locate a firearm. Following the traffic stop, a review of pole camera footage provided a sedan pulling up to the Davis residence and an unidentified male exited the vehicle and walked up to the Davis residence. A few moments later the male walked back to the car from the Davis

13

residence and had a bag in his hand. At this time, it is unknown who the male was, but based on the conversation SMITH had with GRIGGS about a firearms transaction, that male may have been GRIGGS obtaining the firearms previously spoken about. Thus, illustrating the need for cell site data to ascertain if GRIGGS was at the Davis residence at the time of the pole camera footage and if he then went to the Highlawn residence.

21. On November 3, 2023, the Honorable Cheryl A. Eifert, United States Magistrate Judge, signed a geolocation ping warrant for the TARGET TELEPHONE.

22. On November 8, 2023, a Grand Jury in the Southern District of West Virginia returned an indictment against GRIGGS for violations of 18 U.S.C. Section 846 and Section 841(a)(1).

23. A review of the geolocation data associated with the TARGET TELEPHONE provided four instances when the TARGET TELEPHONE was near the Highlawn residence. The Highlawn residence was utilized by MASSEY and members of his DTO to store and distribute controlled substances. The first instances were on November 8, 2023, at approximately 1:27 A.M., the second was November 11, 2023, at approximately 9:01 A.M., the third was on November 12, 2023, at approximately 2:53 A.M., and the fourth was on November 14, 2023, at approximately 11:15 P.M. and 11:42 P.M. While the geolocation data associated with the TARGET

14

TELEPHONE is extremely helpful, the geolocation points are not provided continuously. The geolocation points arrive at approximately fifteen-minute intervals, thus the cell site data would provide a clear picture for where the TARGET TELEPHONE was on the aforementioned dates in November 2023.

24. On November 15, 2023, a search warrant was executed at the Highlawn residence. The Highlawn residence was utilized by MASSEY and members of his DTO to store and distribute controlled substances. At the residence were JASHAWN LAWSON and VERNARD BROWN, both of whom were members of the DTO and federally indicted with GRIGGS on November 8, 2023. LAWSON and BROWN were both arrested. The search of the Highlawn residence provided three firearms, a Kel-Tec CNC pistol, a Walther P22 pistol with a silencer, and a Landor Arms shot gun.

25. On November 27, 2023, GRIGGS turned himself in at the Huntington Federal Courthouse.

26. On January 30, 2024, a Grand Jury in the Southern District of West Virginia returned a superseding indictment against GRIGGS for violations of 18 U.S.C. Section 846 and Section 841(a)(1).

27. This warrant seeks to obtain cell site data for the TARGET TELEPHONE to ascertain where GRIGGS and the TARGET

TELEPHONE were on October 29, 2023, November 8, 2023, November 11, 2023, November 12, 2023, and November 14, 2023.

## CONCLUSION

28. Based on facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of the offense enumerated above has been committed by GRIGGS and others. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B.

29. Further your Affiant sayeth naught.

_____
GEORGIA MARSHALL, SPECIAL AGENT
Federal Bureau of Investigation

SUBSCRIBED AND SWORN before me this 6th day of March, 2024.

_____
HONORABLE CHERYL A. EIFERT
United States Magistrate Judge

16